PARKER, Justice.
Miller Trucking, LLC, Ben Miller, and Miriam Miller (hereinafter collectively referred to as “the Miller plaintiffs”) appeal a summary judgment in favor of APAC Mid-South, Inc. (“APAC”), Oldcastle Materials, Inc. (“Oldcastle Materials”), and Steve Reynolds (hereinafter collectively referred to as “the defendants”). We reverse the judgment and remand the case.

Facts and Procedural History

The facts of this appeal are based on contracts between the Alabama Department of Transportation (“ADOT”) and APAC and between APAC and Miller Trucking. APAC is an aggregate-supply company with quarries in Alabama; Reynolds is APAC’s sales manager for materials in Alabama. As will be discussed in greater detail below, ADOT hired APAC to provide aggregate materials for distribution to counties, and APAC, in turn, hired Miller Trucking to haul the aggregate materials to the counties purchasing *170 the aggregate materials from the State. Of particular importance to this appeal are adjustments to the compensation APAC paid Miller Trucking based on the cost of fuel during the times relevant to this appeal.
The Miller plaintiffs’ complaint set forth the following undisputed facts:
“In 2007, [ADOT] offered county governments in Alabama road building materials at uniform prices. [ADOT] solicited competitive bids from materials companies to cover the cost of the material and the hauling cost which varied depending on the location of the bidder’s quarry and other factors. For example, a bidder might bid $14 to buy and haul rip rap rock from the Alexander City quarry to Coosa County but might bid $26 to haul the same material to a distant county such as Clarke County.”
In order to submit a bid to ADOT, APAC sought proposed bids for statewide, county-by-county hauling rates from various trucking companies, including Miller Trucking. Using Miller Trucking’s bid to APAC, APAC submitted its bid to ADOT. At the time Miller Trucking submitted its bid to APAC it was unaware that the contract eventually entered into by ADOT and APAC would include a fuel-price-adjustment clause.
On June 24, 2007, Miller Trucking entered into a “Hired Trucker Agreement” with Oldcastle Materials Southeast, Inc., d/b/a SRM Aggregates (“SRM Aggregates”) (hereinafter referred to as “the 2007 hired-truck agreement”). In 2007, at some point after the 2007 hired-truck agreement was entered into, SRM Aggregates, which was a wholly owned subsidiary of Oldcastle Materials, merged with APAC. The 2007 hired-truck agreement did not specify the work Miller Trucking was to perform, did not specify how APAC would pay Miller Trucking for the unspecified work, and did not include a fuel-price-adjustment clause.
After considering the submitted bids, ADOT chose APAC to supply a portion of the aggregate materials to the counties. ADOT and APAC entered into a contract at some point in 2007 that was effective until September 30, 2008 (“the 2007 ADOT-APAC contract”). On March 4, 2008, ADOT issued a document entitled “Special Terms and Conditions,” an addendum to the 2007 ADOT-APAC contract, effective from January 15, 2008, to September 30, 2008, allowing the price of the final delivery charge to be adjusted up or down based on the then current price of gasoline (“the 2007 ADOT-APAC fuel-price-adjustment clause”). Under the 2007 ADOT-APAC fuel-price-adjustment clause, as the price of gasoline increased or decreased, ADOT would increase or decrease the hauling rates owed APAC; the 2007 ADOT-APAC fuel-price-adjustment clause allowed for as much as a 15% decrease and as much as a 20% increase in the hauling rates owed to APAC.
Ben Miller’s deposition testimony indicates that fuel prices began increasing during the first quarter of 2008 and that he contacted APAC about the increase. Joe Hughes, an employee of APAC, had informed Ben Miller by telephone “that there was a fuel stipulation” in the 2007 ADOT-APAC contract that allowed APAC to recover increased charges from ADOT based on the rising cost of fuel. On March 19, 2008, Bén Miller e-mailed Linda Lan-dress, his primary contact at APAC, asking her if she had “heard anything on the fuel situation.” Landress responded to Ben Miller’s inquiry with the following email:
“From my understanding, we have someone in [the] accounting department who is going back to all deliveries and, based on rules on state bid, billing the *171 state entities a fuel surcharge. Once they pay, we will reimburse you that surcharge amount. Going forward, we will be adding the surcharge percentage to your haul rates as we set up orders to deliver.”
Ben Miller stated as follows in his deposition testimony about the e-mail exchange between him and Landress:
“Q. ... [W]hat was your understanding of what was going to take place in response to the fuel situation that you referenced in your e-mail?
“[Ben Miller:] That there was a surcharge between APAC and the state, and they would obviously attempt to procure the money.
“Q. Okay. In other words, APAC heard what you were saying, and they were going to invoke the surcharge that was part of their contract with the state?
“[Ben Miller:] Right, because I told APAC I could not haul and no one could.
“Q. Under the current fuel?
“[Ben Miller:] In the current situation.
“Q. The current situation being fuel prices were going up dramatically?
“[Ben Miller:] Yes.
“Q. Okay. So not only in response to what you had asked did APAC say we’re going to make sure that the — that we’ve invoke [sic] the fuel-surcharge provision with the state, but going forward, we’re also going to be adding the surcharge percentage to your haul rates, correct?
“[Ben Miller:] That is what this email says, yes.
“Q. ... [D]id you have an understanding that APAC was going to go back and make sure that the state for all the previous hauls that you had done had upped its fuel price based on the surcharge in the APAC and state contract?
“[Ben Miller:] Previous hauls?
“Q. Previous hauls?
“[Ben Miller:] I’m not aware that they did that. Yeah, I’m not aware.
“Q. Okay. But then on a going-forward basis, did you have an understanding that they were going to be invoking the fuel-surcharge provision and making sure that it was in place so that the price that they received on the state work was adjusted accordingly?
“[Ben Miller:] Yes.
“Q. Okay. And that ... would obviously flow down to Miller Trucking?
“[Ben Miller:] Yes.
“Q. And did that take place in 2008?
“[Ben Miller:] To the best of my knowledge, it did.”
In fact, from January 15, 2008, to September 30, 2008, which was during the term of the 2007 ADOT-APAC contract, APAC paid Miller Trucking approximately $1,000,000 for hauling services; approximately $200,000 of that amount was upward fuel-price-adjustment payments. It appears that APAC paid Miller Trucking in accordance with the bid Miller Trucking submitted to APAC in June 2007 and in accordance with APAC’s and Miller Trucking’s negotiations concerning the escalating cost of fuel.
As the 2007 ADOT-APAC contract was nearing its completion, ADOT again solicited bids to continue supplying aggregate materials to counties throughout the state. Ben Miller’s deposition testimony indicates that in August 2008 APAC requested that Miller Trucking submit a bid to APAC so that APAC could, in turn, submit a bid to ADOT. Ben Miller’s deposition testimony indicates that, before submitting Miller Trucking’s bid to APAC, Ben Miller spoke with Reynolds concerning fuel prices for the coming contractual period; Ben Miller stated that, “from that discussion, I drew *172 the conclusion that I needed to bid on last year’s fuel prices.” Miller Trucking submitted a bid to APAC on September 3, 2008, which assumed fuel prices of $2.50 to $2.70 per gallon. APAC, based on Miller Trucking’s September 3, 2008, bid, placed a bid with ADOT in an effort to secure a contract from ADOT. APAC was awarded a portion of the work by ADOT. On August 30, 2008, ADOT issued a contract between it and APAC for the period October 1, 2008, to September 30, 2009 (“the 2008 ADOT-APAC contract”); the contract included a fuel-price-adjustment clause (“the 2008 ADOT-APAC fuel-price-adjustment clause”). The 2008 ADOT-APAC fuel-price-adjustment clause stated, in part:
“SHOULD AVERAGE FUEL PRICES EXCEED THE HIGHEST PRICE PER GALLON INDICATED IN THE CHART ABOVE, (OR DECREASE BELOW THE LOWEST-LISTED PRICE), THE MILEAGE ADJUSTMENT RATE WILL CONTINUE TO INCREASE (OR DECREASE) IN 5% INCREMENTS FOR EACH $0.20 PER GALLON INCREASE OR DECREASE IN THE REFERENCED AVERAGE FUEL INDEX.”
(Capitalization in original.) The 2007 ADOT-APAC fuel-priee-adjustment clause did not contain similar language but, instead, limited the amount of fuel-priee-adjustment increases or decreases that could be assessed against APAC. On November 20, 2008, APAC sent Ben Miller, via e-mail, notice of the 2008 ADOT-APAC fuel-priee-adjustment clause. The e-mail from APAC to Ben Miller indicated that Reynolds was going to telephone Ben Miller that day to discuss the fuel-price-adjustment clause; the record does not indicate whether that telephone call occurred.
In December 2008, APAC assessed a retroactive, downward fuel-price adjustment against Miller Trucking in the amount of $11,001.30 for work Miller Trucking had performed for APAC. Ben Miller requested a meeting with Reynolds, which occurred in January 2009. Reynolds’s deposition testimony concerning that meeting is as follows:
“[Reynolds:] We discussed the current economic situation and the State contract.
“Q. Did [Ben Miller] let you know at that time that this is a very distressing situation here as far as [Miller Trucking’s] ability to haul and make any kind of money on the haul?
“[Reynolds:] Yes.
[[Image here]]
“Q. ... Is it true that in this meeting [Ben Miller] said, look, you know, we didn’t know about these deductions until after we had already been paid, and we had already paid our haulers; and so, what we need is a situation in the future where [APAC] quote[s] a rate to us, and then [Miller Trucking] decide[s] whether [Miller Trucking] want[s] to haul under that rate? Did you [and Ben Miller] have that kind of discussion?
“[Reynolds:] We did.
“Q. And did APAC agree at that time when they tendered a load to Miller [Trucking] that it would be tendered with the adjusted rate so [Miller Trucking] could make a decision as to whether [it] could profitably do the haul?
“[Reynolds:] No, that’s not my recollection at all.
“Q. What is your recollection about that understanding or that discussion?
“[Reynolds:] That’s when we agreed that we would ask the counties to accept less of a discount at the 10 percent rate.
“Q. Accept less than the 10 percent?
*173 “[Reynolds:] No, accept 10 percent, rather than the full 50 or 40 [percent] or whatever it might have been at the time.
“Q. Did you tell [Ben Miller] ... that you thought that could be arranged?
“[Reynolds:] No, I told [Ben Miller] we would attempt to do that.
“Q. And what did you contemplate at that time would make up your attempt?
“[Reynolds:] Well, when the orders came in, we would ask. We would explain the situation and ask the counties, which the price that they would be paying was still lower than the bid, so they would accept it.
[[Image here]]
“Q. ... After this meeting, did you tell Ms. Landress to do anything different in the way that she communicated the hauls to Miller Trucking?
“[Reynolds:] Yes.
“Q. Tell me what was old and what was new.
“[Reynolds:] Well, what was new was that the counties that had accepted the 10 percent discount, she was to let [Miller Trucking] know that they had accepted that. The ones that didn’t accept it, she was to let [Miller Trucking] know that, as well.
[[Image here]]
“Q. I understand you to say that there was no agreement reached. You deny there was an agreement reached about whether Miller [Trucking] would be tendered a load with the exact rate that they would get quoted so that they could make a decision. I understand you say there was no agreement to do that. But what I’m asking you is: After that meeting, would Miller Trucking be told by APAC what the actual rate would be that they would be hauling at if they accepted the load?
[[Image here]]
“[Reynolds:] Yes.
[[Image here]]
“Q. Was there any discussion at that time that if Miller [Trucking] would hang in there, so to speak, and continue to haul that Miller [Trucking] would be a preferred hauler for other more lucrative projects in the future?
“[Reynolds:] Yes, we told Ben [Miller] that we would try to help him on other contracts outside of [the 2008 ADOT-APAC contract], that we would try to help him, because this is a small portion of the total business that we do. So, with other opportunities out there, yes, we certainly wanted to assist him with his difficulties.”
Ben Miller’s deposition testimony concerning the same meeting states:
“Q. Okay. And what was the gist of what was discussed at the meeting to the extent that you recall?
“[Ben Miller:] We were getting retroactive deductions in arrears. We couldn’t — we were paying the trucks X amount, and we were getting random deductions.™ We didn’t know what we were getting paid to haul for, and we needed to do something. And at this point, the best of my memory, [Reynolds] was going to instruct [Landress] to give me the rate as she had done in the previous year; and she did do that for a couple of e-mails, and then it stopped.
“And then we were also told that there was a 10 percent, a kitty of some sort, and our understanding was there *174 was money being put into that kitty, that 10 percent, or would be put into that 10 percent — would be put into the kitty of 10 percent, and they would use that for any future deductions. And there would be no more monstrosity deductions of [$]40[,000] to $50,000 way after the fact.
[[Image here]]
“Q. Okay. So you walked away from that meeting with the understanding of the following points, that number one, they had some sort of a kitty set up where they would set aside 10 percent of all the hauling that you were going to be doing—
“[Ben Miller:] Yes.
“Q. —going forward?
“[Ben Miller:] Yes.
[[Image here]]
“Q. Okay. And there would be no more deductions?
“[Ben Miller:] That is correct.
[[Image here]]
“Q. Okay. Was the gist of the meeting something needs to change or we can’t haul any more under this contract?
“[Ben Miller:] Yes.
[[Image here]]
“Q. ... In the [January 2009] meeting ..., did you understand, based on what Mr. Reynolds said, that [APAC was] going to give [Miller Trucking] the rate — when [APAC] tendered a haul to [Miller Trucking], [APAC was] going to give [Miller Trucking] the rate and also whether there would be any adjustment, based on the fuel cost, where [Miller Trucking] could make a decision?
“[Ben Miller:] Absolutely, yes. That’s my point.”
On February 7, 2009, following Ben Miller’s meeting with Reynolds, Ben Miller sent the following e-mail to Landress:
“This is a dire emergency. I met with [Reynolds] two weeks ago about the fuel situation concerning the State. It was my impression [that] he was going to instruct [another APAC employee] to bill at the quoted rate from January 9, 2009, forward, and re[-]bill all prior hauling at said rate. I even spoke with [another APAC employee] about the same issue to make sure all was well, and she assured me January 9, 2009, would be the last check with any type of deduction. We have now incurred a $43,371.52 (this money was paid to the truck owners ... gone) loss this fiscal year for negative fuel charges, and are still owed approximately $1600.00 in unpaid fuel surcharges for the previous year. No company can handle this type of loss. At this rate we will be unable to meet payroll for the coming week. We must address this as soon as possible. We do not want to quit hauling on the State Contract, but at this point it looks as if we must. Please call me as soon as possible. This is an emergency.”
On February 9, 2009, Landress responded via e-mail, as follows: “Well, you might know, my first time after being told to put the haul rate on these e-mails — I forgot. Anyway, the haul rate is $5.40 per ton .... ” Reynolds’s deposition testimony indicates that, following his meeting with Ben Miller in January 2009, he had instructed Landress to include the haul rate in her e-mails to Miller Trucking.
On January 5, 2009, Miller Trucking signed a “Hired Truck Qualification Agreement” with APAC and Oldcastle Materials (“the 2009 hired-truck qualification agreement”). The 2009 hired-truck qualification agreement set forth the work Miller Trucking was to perform and gave Miller Trucking the right to “accept or reject any assignments tendered to it” by APAC. The 2009 hired-truck qualification agreement *175 states that Miller Trucking “shall submit to [APAC] requests/applications for payment based on [APAC] hourly rates in effect at the time the work is performed ... and shall be paid monthly, by the 10th calendar day of the’ following month.” A fuel-price-adjustment clause was not included in the 2009 hired-truck qualification agreement. Further, the 2009 hired-truck qualification agreement contained the following provision:
“11.3 Complete Agreement. This agreement contains all covenants, stipulations and provisions agreed upon between [APAC] and [Miller Trucking] relating to [Miller Trucking’s] Work. No prior or contemporaneous agreement or understanding with any employee, agent or representative of [APAC] or [Miller Trucking] pertaining to the same shall be valid or of any force or effect. No changes, amendments or modifications of this Agreement shall be valid or of any effect unless reduced to writing and signed by the parties hereto.”
During the term of the 2008 ADOT-APAC contract, APAC paid Miller Trucking approximately $800,000 for hauling services, which sum reflected approximately $125,000 in downward fuel-price adjustments. The amount APAC paid Miller Trucking for Miller Trucking’s hauling services does not appear to have been based on an hourly rate, as required by the 2009 hired-truck qualification agreement, but upon Miller Trucking’s bid, which appears to have been based on mileage traveled by Miller Trucking during its deliveries on behalf of APAC.
On December 11, 2009, APAC submitted to the Alabama Board of Adjustment a claim for $147,014.75. In the claim filed with the Board of Adjustment, APAC stated: “State aggregate contract fuel adjustments deducted from 3rd party hauler (Miller Trucking). Hauler is asking for relief based on deductions already taken. (Please see attached documentation).” The “attached documentation” was a Microsoft Power Point presentation created by Ben Miller. Reynolds’s deposition testimony indicates that the amount claimed, $147,014.75, “was the total of the fuel surcharge deducts that [APAC] had on the books at the time.” The Board of Adjustment returned APAC’s claim on January 11, 2010, because APAC had failed to identify the state agency that was responsible for the $147,014.75. The parties do not state whether APAC supplied the requested information to the Board of Adjustment.[2]
On June 4, 2010, the Miller plaintiffs sued the defendants alleging breach of contract, suppression of information, misrepresentation, conversion, and unjust enrichment. On July 26, 2010, the defendants filed a motion to compel arbitration, which the circuit court denied on August 30, 2010. The defendants did not appeal the circuit court’s order denying their motion to compel arbitration.
On October 5, 2010, the defendants filed answers to the Miller plaintiffs’ complaint. In addition, APAC filed a counterclaim against the Miller plaintiffs requesting a judgment declaring the parties’ “rights, duties, status and legal relations” under the 2007 hired-truck agreement, the 2009 hired-truck qualification agreement, the 2007 ADOT-APAC contract, and the 2008 ADOT-APAC contract. APAC also as *176 serted in its counterclaim claims of breach of contract and unjust enrichment.
On May 20, 2011, the Miller plaintiffs filed a motion for a partial summary judgment, arguing that “because [Miller Trucking] did not contractually agree to any fuel-cost adjustments prior to January 4, 2010, the [defendants had no proper legal basis for imposing any fuel-cost adjustments upon [Miller Trucking] prior to January 4, 2010.” The Miller plaintiffs also argued that “[b]ecause the terms of the pre-2010 contracts are plain arid unambiguous, any questions concerning their construction and legal effect upon the parties are proper issues to be decided by a summary judgment.”
On October 24, 2011, the circuit court entered the following order:
“The parties are relieved of their obligation under the scheduling order to mediate their dispute by October 31, 2011. Cross-motions for summary judgment — referable to the contract provision that appears to be the roadblock to efforts to resolve this matter — are to be filed by November 10, 2011, with cross responses to be filed by November 21, 2011.”
It is unclear to which contract provision, or even which contract, the circuit court was referring in its order.
On November 10, 2011, the defendants filed a motion for a summary judgment. The defendants argued that “Miller Trucking’s bid rates and the fuel-price adjustment clause[s] in the [2007 ADOT-APAC contract and the 2008 ADOT-APAC contract] governed the manner and method of APAC’s payments to Miller Trucking.” The defendants argued that
“[t]he fuel-price adjustment clause applies to Miller Trucking because (lj the [2007 ADOT-APAC contract and the 2008 ADOT-APAC contract were] incorporated by reference into the [2007 hired-truck agreement], (2) a course of dealing established that APAC paid Miller Trucking’s bid rate as modified by the fuel-price adjustment clause, and (3) it cannot take the benefits of the State Contract, but reject its burdens.”
Following a hearing on January 30, 2012, the circuit court entered its final judgment on February 7, 2012:
“Pending in this action are cross-motions for summary judgment. The [Miller] plaintiffs have filed a motion for partial summary judgment, seeking a declaration that ‘because [Miller Trucking] did not agree to any fuel-cost adjustments prior to January 4, 2010, the Defendant had no proper legal basis for imposing any fuel cost adjustments upon [Miller Trucking] prior to January 4, 2010.’ The defendants’ motion also seeks a declaration of the parties’ rights and obligations pursuant to the agreement that existed among the parties.
“In addressing the motions, the Court confronts a situation in which there existed an agreement between Miller Trucking, LLC and APAC Mid-South, Inc. (or a predecessor thereof), but the agreement did not completely define the relationship between the parties, which relationship was developed over the course of a couple of years. The Court finds that the continuing course of dealings and course of performance during this period of time is determinative in defining the parties’ respective rights and obligations.
“It is proper to examine such circumstances, which fall outside the confines of any written agreement that might exist. The ... 2007 [hired-truck] [a]greement contains no integration clause. The ... 2009 [hired-truck qualification] [a]greement does contain an integration clause, but that contract does *177 not accurately describe payment arrangements, providing only that Miller Trucking shall submit requests for payment on ‘hourly rates in effect at the time the work is performed.’ While that contract further provides that any modification must be in writing to be effective, Alabama law has held that such language is essentially surplusage, as parties may orally modify even a contract requiring that any modification be in writing (absent a statute of frauds issue). See, e.g., Duncan v. Rossuck, 621 So.2d 1813, 1315 (Ala.1993). It is therefore proper to look beyond the contract to ascertain how the parties’ actions and understandings have modified the written contracts existing between them.
“In doing so, the Court relies on Restatement (Second) of Contracts § 202 (1981), which provides in part the following:
“ ‘(4). Where an agreement involves repeated occasions for performance by either party with knowledge of the nature of the performance and opportunity for objection to it by the other, any course of performance accepted or acquiesced in without objection is given great weight in the interpretation of the agreement.
“ ‘(5). Wherever reasonable, the manifestations of intention of the parties to a promise or agreement are interpreted as consistent with each other and with any relevant course of performance, course of dealing, or usage of trade.’
“Further, ‘[w]hen the parties to a bargain sufficiently defined to be a contract have not agreed with respect to a term which is essential to a determination of their rights and duties, a term which is reasonable in the circumstances is supplied by the court.’ Restatement (Second) of Contracts at § 204.
“Based on the evidence presented by the parties, the Court concludes that there was an understanding that any effect of fuel cost adjustments imposed by the State of Alabama would be passed on by APAC to Miller Trucking. Miller Trucking enjoyed the benefits of such adjustments during the first year of its relationship with APAC; it should bear the burden of the adjustments occurring in the second year.
“Alternatively, even if an enforceable contract cannot properly be found to arise from the facts, [Miller Trucking is] equitably estopped from denying being bound by the fuel adjustment provision in the second year of APAC’s arrangement with the State of Alabama, having enjoyed the fruits of that provision during the first year and having worked with APAC for several months during the second year with knowledge of the fuel adjustment provision.
“The [Miller] plaintiffs’ motion for partial summary judgment is accordingly denied, while the defendants’ summary judgment motion is granted.
“With this ruling, the Court dismisses [the Miller] plaintiffs’ claims in this action, with prejudice. The Court finds in favor of APAC on its counterclaim for a declaratory judgment and finds that APAC’s other counterclaims need not be addressed. This order concludes this litigation, with costs taxed as paid.”
The Miller plaintiffs appealed.

Standard of Review

Our standard for reviewing a summary judgment is well settled:
“ ‘The standard of review applicable to a summary judgment is the same as the standard for granting the motion.... ’ McClendon v. Mountain Top Indoor *178 Flea Market, Inc., 601 So.2d 957, 958 (Ala.1992).
“ ‘A summary judgment is proper when there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law. Rule 56(c)(3), Ala. R. Civ. P. The burden is on the moving party to make a prima facie showing that there is no genuine issue of material fact and that it is entitled to a judgment as a matter of law. In determining whether the movant has carried that burden, the court is to view the evidence in a light most favorable to the nonmoving party and to draw all reasonable inferences in favor of that party. To defeat a properly supported summary judgment motion, the nonmoving party must present “substantial evidence” creating a genuine issue of material fact — “evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.” Ala.Code 1975, § 12-21-12; West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989).’
“Capital Alliance Ins. Co. v. Thorough-Clean, Inc., 639 So.2d 1349, 1350 (Ala.1994). Questions of law are reviewed de novo. Alabama Republican Party v. McGinley, 893 So.2d 337, 342 (Ala.2004).”
Pritchett v. ICN Med. Alliance, Inc., 938 So.2d 933, 935 (Ala.2006).

Discussion

As set forth above, the circuit court concluded in its final order “that there was an understanding that any effect of fuel cost adjustments imposed by [ADOT] would be passed on by APAC to Miller Trucking.” As the circuit court recognized, there was no written agreement between APAC and Miller Trucking containing such a provision. Instead, the circuit court concluded that, based on the parties’ course of dealings, there was no genuine issue of material fact as to whether the parties had agreed that the effect of the 2007 ADOT-APAC fuel-price-adjustment clause and the 2008 ADOT-APAC fuel-price-adjustment clause would be passed on to Miller Trucking by APAC. The Miller plaintiffs argue on appeal that there is a genuine issue of material fact as to whether APAC and Miller Trucking actually entered into such an agreement. We agree with the Miller plaintiffs.
First, the 2007 hired-truck agreement was not an enforceable contract. In White Sands Group, L.L.C. v. PRS II, LLC, 998 So.2d 1042, 1051 (Aa.2008), we held that “ ‘[t]o be enforceable, the [essential] terms of a contract must be sufficiently definite and certain....’” (quoting Brooks v. Hackney, 329 N.C. 166, 170, 404 S.E.2d 854, 857 (1991)). We also held in White Sands that “‘[a] lack of definiteness in an agreement may concern the time of performance, the price to be paid, work to be done, property to be transferred, or miscellaneous stipulations in the agreement.’ 1 Richard A. Lord, Williston on Contracts § 4:21, at 644 (4th ed.2007).” 998 So.2d at 1051. The 2007 hired-truck agreement did not contain any details concerning what work Miller Trucking was to perform, when Miller Trucking was to perform the work, or any details concerning the price APAC would pay for Miller Trucking’s services. Therefore, the 2007 hired-truck agreement was not an enforceable agreement.
APAC and Miller Trucking did, however, enter into a contract in 2007 when APAC accepted Miller Trucking’s bid (“the 2007 APAC-Miller Trucking contract”). In its bid, Miller Trucking speci- *179 fíed the rates it would charge for the hauling services it was to perform for APAC. APAC accepted Miller Trucking’s bid, thereby creating the 2007 APAC-Miller Trucking contract. APAC and Miller Trucking operated under the 2007 APAC-Miller Trucking contract for the duration of the 2007 ADOT-APAC contract.
As set forth above, in early 2008 when fuel prices began escalating, Miller Trucking approached APAC to request that APAC increase the price APAC was paying Miller Trucking for its hauling services; the prices APAC was paying Miller Trucking were based on the bid Miller Trucking had submitted to APAC, Essentially, Miller Trucking sought to modify the terms of the 2007 APAC-Miller Trucking contract. At Miller Trucking’s request, APAC agreed to pay Miller Trucking more than the bid rate, based on the escalating fuel costs. Ben Miller’s deposition testimony to the effect that APAC did not begin to pay Miller Trucking increased compensation based on the rising cost of fuel until Miller Trucking requested APAC do so is substantial evidence that APAC and Miller Trucking were not operating under the 2007 ADOT-APAC fuel-price-adjustment clause from the outset of thS 2007 APAC-Miller Trucking contract. During the term of the 2007 ADOT-APAC contract, APAC paid Miller Trucking approximately $1,000,000, of which $200,000 was increased payments based on. APAC and Miller Trucking’s modification of the 2007 APAC-Miller Trucking contract to take into account the escalating cost of fuel.
APAC and Miller Trucking entered into a new agreement on or about September 3, 2008, when Miller Trucking submitted a bid to APAC, which APAC accepted, so that APAC could, in turn, submit a bid to ADOT (“the 2008 APAC-Miller Trucking contract”). APAC’s bid was accepted by ADOT, which formed the basis of the 2008 ADOT-APAC contract. The 2008 APAC-Miller Trucking contract did not include a provision for fuel-price adjustments but was based upon static fuel prices of $2.50 to $2.70 per gallon.
In December 2008, APAC assessed a retroactive, downward fuel-price adjustment against Miller Trucking in the amount of $11,001.30; APAC’s authority to assess a retroactive, downward fuel-price adjustment is the primary issue in this appeal. There is substantial evidence to indicate that the 2008 APAC-Miller Trucking contract did not include a fuel-price-adjustment provision and that Miller Trucking immediately contacted APAC to object to the downward fuel-price adjustment. Reynolds’s deposition testimony indicates that Miller Trucking was unaware that APAC was going to assess downward fuel-price adjustments before APAC actually did so in December 2008., Reynolds and Ben Miller met in January 2009 to negotiate how Miller Trucking would be compensated, taking into consideration the varying fuel prices, from that time forward.
On January 5, 2009, APAC and Miller Trucking entered into the 2009 hired-truck qualification agreement. However, the 2009 hired-truck qualification agreement specified that Miller Trucking would be paid on an hourly basis, which, despite the clear and unambiguous language in the 2009 hired-truck qualification agreement, has never been the practice between APAC and Miller Trucking. It is unclear from the record if Reynolds and Ben Miller’s early January 2009 meeting occurred before or after APAC and Miller Trucking entered into the 2009 hired-truck qualification agreement. Therefore, it is unclear whether the negotiations that took place between Reynolds and Ben Miller at the January 2009- meeting were an effort to *180 modify the 2008 APAC-Miller Trucking contract or the 2009 hired-truck qualification agreement. Regardless, as evidenced by Ben Miller’s February 7, 2009, e-mail to Landress and Landress’s February 9, 2009, e-mail response, the parties continued to negotiate the compensation Miller Trucking was to receive from APAC after APAC and Miller Trucking entered into the 2009 hired-truck qualification agreement.
We cannot conclude, as did the circuit court, that there is no genuine issue of material fact as to whether APAC and Miller Trucking agreed that the 2007 ADOT-APAC fuel-price-adjustment clause and the 2008 ADOT-APAC fuel-price-adjustment clause were incorporated into the contracts between APAC and Miller Trucking. Reynolds’s deposition testimony is substantial evidence that APAC was going to negotiate a deal with the counties receiving the aggregate materials pursuant to which the counties would pay less than the bid price, but more than the price called for by the 2008 ADOT-APAC fuel-price-adjustment clause. Therefore, there is substantial evidence in the record that APAC and Miller Trucking did not simply agree to incorporate into their agreements the 2007 ADOT-APAC fuel-price-adjustment clause and the 2008 ADOT-APAC fuel-price-adjustment clause.
APAC and Miller Trucking entered into several contracts over the period relevant to this appeal. APAC imposed downward fuel-price adjustments during the periods the 2008 APAC-Miller Trucking contract and the 2009 hired-truck qualification agreement were in effect, which periods may have overlapped. Neither the 2008 APAC-Miller Trucking contract nor the 2009 hired-truck qualification agreement contained a fuel-price-adjustment clause authorizing APAC to assess downward fuel-price adjustments against Miller Trucking. APAC and Miller Trucking engaged in negotiations after the formation of the 2008 APAC-Miller Trucking contract and the 2009 hired-truck qualification agreement to modify the terms of the 2008 APAC-Miller Trucking contract and/or the 2009 hired-truck qualification agreement to include a provision allowing APAC to assess downward fuel-price adjustments. As evidenced by the substantial evidence in the record, APAC and Miller Trucking did not agree to incorporate the 2008 ADOT-APAC fuel-price-adjustment clause into either of those agreements but negotiated their own fuel-price-adjustment agreement, which modified the terms of the 2008 APAC-Miller Trucking contract and/or the 2009 hired-truck qualification agreement. Therefore, a genuine issue of material fact exists as to the circuit court’s finding “that there was an understanding [between APAC and Miller Trucking] that any effect of fuel cost adjustments imposed by [ADOT] would be passed on by APAC to Miller Trucking.”
We also hold that there is a genuine issue of material fact concerning the findings supporting the circuit court’s alternative holding. The circuit court held that
“even if an enforceable contract cannot properly be found to arise from the facts, [Miller Trucking is] equitably es-topped from denying being bound by the [2008 fuel-price-adjustment clause], having enjoyed the fruits of [the 2007 fuel-price-adjustment clause] and having worked with APAC for several months during the second year with knowledge of the [2008 fuel-price-adjustment clause].”
The circuit court did not conclude, and no party has argued, that Miller Trucking was a third-party beneficiary of either the 2007 ADOT-APAC contract or the 2008 ADOT-APAC contract and, thus, that Mil *181 ler Trucking was receiving the benefit of the 2007 ADOT-APAC fuel-price-adjustment clause or the 2008 ADOT-APAC fuel-price-adjustment clause. Instead, during the term of the 2007 ADOT-APAC contract, as set forth above, Miller Trucking went to APAC and negotiated a modification to the 2007 APAC-Miller Trucking contract allowing Miller Trucking to receive increased payment for its hauling services based on escalating fuel costs. Likewise, during the term of the 2008 APAC-Miller Trucking contract, APAC and Miller Trucking again entered into negotiations concerning the compensation due Miller Trucking as a result of the falling fuel prices. Miller Trucking has never contracted with ADOT, and nothing indicates that Miller Trucking was a third-party beneficiary of either the 2007 ADOT-APAC contract or the 2008 ADOT-APAC contract. Rather, APAC and Miller Trucking have maintained their own contractual relationship. Therefore, the circuit court’s conclusion that Miller Trucking gained a benefit under the 2007 ADOT-APAC contract and, therefore, must carry the burden of the 2008 ADOT-APAC contract is contrary to the facts before us.
Therefore, we reverse the circuit court’s summary judgment in favor of the defendants.
The Miller plaintiffs present several other arguments; however, our decision to reverse the circuit court’s summary judgment in favor of the defendants pretermits discussion of those issues.

Conclusion

Based on the foregoing, we reverse the circuit court’s summary judgment in favor of the defendants and remand the case for further proceedings. A genuine issue of material fact exists as to whether the 2008 APAC-Miller Trucking contract and the 2009 hired-truck qualification agreement were modified to include fuel-price-adjustment agreements and, if so, what the terms of those agreements are.
REVERSED AND REMANDED.
MALONE, C.J., and STUART, SHAW, and WISE, JJ., concur.

. On January 4, 2010, APAC and Miller Trucking entered into a "renewable trucking agreement” (“the 2010 renewable trucking agreement”). The facts forming the basis of this appeal had transpired before the parties entered into the 2010 renewable trucking agreement; thus, the 2010 renewable trucking agreement does not appear to have any relevance to this appeal.

. Miller Trucking subcontracted the hauling work that APAC hired it to perform. Miller Trucking did not own any equipment and did not have any drivers who worked directly for it.